QUINN-MOORE et al *v.* Beverly J. LAMBERT,
Bank Commissioner et al

80-150                                            614 S.W. 2d 230

Supreme Court of Arkansas
Opinion delivered April 20, 1981

*Friday, Eldredge & Clark*, by: *Herschel H. Friday* and *George Pike, Jr.*, and *Stephen A. White*, for appellants.

*Steve Clark*, Atty. Gen., by: *Merl Barnes*, Deputy Atty. Gen. and *Frederick K. Campbell*, Asst. Atty. Gen., for Beverly J. Lambert, Steve Clark and State of Arkansas.

*James E. Youngdahl*, for AFL-CIO of Arkansas.

*Central Arkansas Legal Services*, by: *Bill Rahn* and *Thomas J. Ginger*, for Elizabeth McAllester.

GEORGE ROSE SMITH, Justice. This is a test case brought to challenge the constitutional validity of Article 19, § 13, of the 1874 Constitution of Arkansas, which provides that all

contracts for a greater rate of interest than 10% per annum shall be void as to principal and interest. More than 130 witnesses presented testimony, much of it cumulative, at a six-week trial. This appeal is from a judgment holding that our constitutional provision does not offend the due process clause, the equal protection clause, or the commerce clause of the Constitution of the United States.

The only borrower among the appellants is Quinn-Moore, a joint venture which tried to borrow $385,000 to improve its truck-stop near Little Rock. Quinn-Moore arranged to borrow the money from two Arkansas banks at 12% interest, but the State Bank Commissioner ruled that the loan would be illegal. Quinn-Moore and the two banks then brought this action for a declaratory judgment, naming the Bank Commissioner and the Attorney General as defendants. Intervenors in support of the plaintiffs included the Arkansas Bankers Association, the Arkansas Savings & Loan Association, the Arkansas Mortgage Bankers Association, and others often falling within the definition of a moneyed corporation: "A corporation authorized to engage in the business of using money for the sake of making a profit upon it as money, as in case of banks, insurance companies, etc." Webster's Second New International Dictionary (1939). A few consumer representatives intervened in support of the defendants.

The essential facts, winnowed from a 3,500-page record, are not complicated. Banks, savings and loan associations, and similar moneyed corporations engage in lending money, but they do not have and doubtless cannot have the resources to lend their own money, in the sense of money contributed by their stockholders. Instead, financial institutions obtain money from the public by means of checking accounts, savings accounts, certificates of deposit, and other forms of borrowing. Those funds are then lent to others at an interest rate higher than the institutions themselves are paying.

For a century following the adoption of our 1874 Constitution the 10% interest ceiling presented no particular problems to moneyed corporations. They were able to pay

not more than 2½% interest on deposits and to relend profitably at 8% to 10%. But in the first half of the 1970's interest rates began to rise nationally at a rapid pace. Contributing factors were the Federal Reserve Board's attempts to halt inflation by means of high interest rates and the action of certain central banks in New York City and elsewhere fixing their prime interest rates at high levels. Arkansas financial institutions naturally had to pay higher interest rates to obtain money to lend, but the 10% usury limit fixed a ceiling that narrowed the margin of profit. Congress provided some relief by permitting certain institutions to charge more than the state's maximum. Congress also permitted the sale of money market certificates, beginning in June, 1978. Those certificates, however, paid such high rates of interest that they attracted money from checking and savings accounts and thus, as one expert witness put it, were a disaster to the supply of loanable funds.

When this case was tried in the fall of 1979 the moneyed corporations were unquestionably operating profitably. The Bank Commissioner testified that the institutions' growth and profits had not been affected, but the squeeze was beginning to show. Various economies had been put into effect. One bank had reduced its staff by 71 persons; a mortgage company had dropped from 17 employees to 12. Even so, profits continued. One witness's complaint was that his bank has only $325,000,000 out on loan, when without the 10% interest ceiling it might have been $400,-000,000. There was other similar testimony.

The witnesses tended to stress not so much that the moneyed corporations were being hurt but that consumers were suffering. Some banks had stopped making loans of less than $2,000; others had somewhat lower minimums. About 15 affidavits, as abstracted, contain an identical sentence: "Borrowers are being hurt because of our institution's inability to loan money to them." Yet the general public is not shown to be dissatisfied with the 10% usury limit. The Secretary of State testified that at the 1974 general election a proposal to remove the interest ceiling by authorizing the legislature to control it was defeated by a vote of more than six to one, 426,197 to 66,905.

As far as we know, usury laws exist in all the states. See *Usury: Issues in Calculation*, 34 Ark. L. Rev. 442, 444 (1980). Such laws are based upon a universally recognized public policy that protects necessitous borrowers from the exaction of exorbitant interest by unscrupulous lenders. Indeed, the appellants themselves concede the need for some ceiling on interest rates, for they say about the 1874 constitutional limitation: "The law should be stricken so that reasonable laws governing the use of money can be enacted. There are literally hundreds of rational methods of regulating interest rates. ... The law must be stricken to make way for rational regulation." Thus the argument stresses reasonableness: Some interest ceiling is permissible, but a limitation of 10% is arbitrary.

We turn first to the appellants' principal point, that the challenged rate is so irrational as to deny them due process of law. Counsel impliedly concede that they have not been able to find a single case decided anywhere at any time holding that an interest ceiling denies due process of law. Faced with this total want of supporting authority, counsel have come up with a theory that interest is the price paid for money and therefore any regulation of interest rates is a forbidden method of price fixing. Actually, money is the medium of exchange and cannot itself have a price except in relation to foreign currency.

Two lines of cases are cited, but neither bears any real resemblance to the case at hand. First are public utility rate cases, in which the courts hold that a rate of return cannot be so low as to confiscate the utility company's property. But the clear-cut distinction is that a public utility devotes its property to the public service, must serve any and all members of the community without discrimination, and is therefore entitled to a guaranteed but reasonably limited return on its investment. By contrast, the appellants do not devote their property to the public service, are entitled to pick and choose those to whom they will make loans, and are not entitled to a guaranteed return of any kind.

Second are cases invalidating laws that seek to set a minimum price for goods or services having no bearing

upon the public health or safety. We have, for example, struck down a law making it a misdemeanor for a barber to charge less for a haircut or shave than the minimum price fixed by the State Board of Barber Examiners. *Noble* v. *Davis*, 204 Ark. 156, 161 S.W. 2d 189 (1942). In a later case we struck down a "fair trade" law permitting a manufacturer to fix the minimum price at which his product could be sold at retail. *Union Carbide & Carbon Corp.* v. *White River Distributors*, 224 Ark. 558, 275 S.W. 2d 455 (1955). Such cases protect the public from being overcharged by means of an artificial floor keeping prices at high levels.

Here, by contrast, the appellants seek a license to charge any interest rate they choose, bringing us full circle back to the very purpose of the usury laws. Moreover, the financial squeeze on which the moneyed corporations base their argument must be attributed in a substantial degree to the actions of the financial institutions themselves, especially the large New York banks. We find no violation of due process of law.

The appellants' argument under the commerce clause is to some extent a repetition of their due process argument, with the added statement that our assertedly arbitrary usury limit is a burden on interstate commerce. We are not sure, however, just what kind of commerce is being burdened. Apparently the reference is to the flow of money when it is sent from one state to be lent or invested in another state. Certainly, according to the proof, money does leave Arkansas when out-of-state investments are available at a higher rate of interest. One witness testified, for example, that his bank loses investments in certificates of deposit whenever the interest rate elsewhere is more than a fourth of one per cent above the Arkansas rate. Even so, that is apparently a natural result whenever one state, although halfway across the continent, offers a better investment opportunity than another. If that is an unconstitutional burden on interstate commerce, then such burdens occur constantly, and all interest restrictions become invalid. Every such argument is self-defeating.

Finally, the appellants' equal protection argument

hardly requires serious discussion. The 10% usury limit contains no classification of any kind, has a similar effect upon all persons similarly situated, and thus cannot deny equal protection. The appellants merely mention differing remote consequences of the law, such as the small borrower's inability to obtain a loan from certain banks in Little Rock because those banks cannot profitably lend small amounts. Almost every constitutional provision has indirect consequences that may affect different persons in different ways, but there is no denial of equal protection unless the constitutional provision itself embodies an unreasonable classification. No inequality is to be found in the challenged section of our Constitution.

Ultimately the question in this case narrows down not to an issue of constitutional law but to one of public policy: What should be the maximum interest rate in Arkansas? The appellants' extensive testimony can certainly be interpreted to indicate that on balance the present effect of our 10% usury ceiling is not favorable to the state's economy as a whole. There is also testimony to the contrary. We are not called upon, however, to pass judgment upon the wisdom of our usury law. If it is to be changed it must be done by popular vote, not by judicial decision.

Affirmed.

HOLT, J., not participating.