**In re Troy L. BROOKS.**

**No. 1999–SC–0547–KB.**

Supreme Court of Kentucky.

Feb. 24, 2000.

William D. Kirkland, W. Terry McBrayer, J. Bradford Derifield, McBrayer, McGinnis, Leslie & Kirkland, Frankfort, for applicant.

Ronald M. Hayes, Grant M. Helman, Robert S. Miller, Kentucky Bar Association, Frankfort, for respondent.

**OPINION AND ORDER**

Troy L. Brooks seeks an order of this Court to permit him to take the Kentucky State Bar Examination at the next appropriate date.

Brooks claims to be a life-long resident of Kentucky who presently lives in Bowling Green and commutes to Clarksville, Tennessee where he practices law. Brooks is a 1993 graduate of the Nashville School of Law in Nashville, Tennessee, a law school which is not accredited by the American Bar Association or the American Association of Law Schools.

Brooks passed the Tennessee Bar Examination in February, 1994, and began practicing law in 1995. He asserts that he has appeared before every level of the Tennessee court system and is admitted to

practice before all the courts of Tennessee and also in the U.S. District Court for the Middle District of Tennessee and the United States Sixth Circuit Court of Appeals.

Brooks was denied the opportunity to take the Kentucky Bar Examination by the Kentucky Board of Bar Examiners on May 5, 1999. In support of his motion, Brooks argues that his personal situation is rare and might not likely ever become commonplace. He claims his motion does not let down the bars for graduates of questionable law school "mills" but rather gives vitality to the letter and spirit of SCR 2.070(2).

The rule in question, SCR 2.070(2), which contains an amendment adopted in 1995, known as Subsection (a), provides in relevant part as follows:

> (2) An attorney who received a legal education in the United States but is not eligible to sit for the examination by virtue of not having attended a law school approved by the American Bar Association or the Association of American Law Schools may nevertheless sit for the examination provided the attorney satisfies the following requirements:
>
> (a) the attorney holds a J.D. degree, which is not based on study by correspondence, from a law school accredited in the jurisdiction where it exists and which requires the equivalent of a three year course of study that is the substantial equivalent of the legal education provided by approved law schools located in Kentucky.

In this matter we are called upon to interpret the following language in Subsection A, "The substantial equivalent of the legal education provided by approved law schools located in Kentucky."

The Board of Bar Examiners responds to the motion that, pursuant to the rule, it cannot approve the education received by Brooks at the Nashville School of Law as the equivalent of a three-year course of study that is the substantial equivalent of the legal education provided by approved law schools in Kentucky.

The Board of Bar Examiners in entertaining the application by Brooks employed W. Jack Grosse, former Dean of the Chase College of Law at Northern Kentucky University, currently a Professor of Law at that institution and a nationally recognized expert in regard to law school accreditation, to evaluate the Nashville School of Law in connection with the Brooks application. Dean Grosse filed a report which was unfavorable to the Nashville School of Law which the Board incorporated in its decision.

The Board of Bar Examiners defined the phrase "substantial equivalent" to mean that a law school must be comparable in resources, physical facilities and faculty to a Kentucky institution. The Board argues that the determination of whether a graduate of any institution is competent to take the Kentucky Bar Examination is determined by the standards required of the school from which that individual graduates. The actual skills acquired by the applicant may be determined later by a bar examination. Such threshold review is not uncommon and is practiced in all 50 of the states of the United States. In addition, Kentucky requires, as do most other states in this country, an examination by the Character and Fitness Committee, or its equivalent, as to the integrity of the individual seeking to qualify for examination.

Here, Brooks started at a community college in 1982 and graduated from Western Kentucky University in 1987. He attended Chase College of Law at Northern Kentucky University from August 1987 to October 1988, at which time he withdrew from Chase Law School. In 1990, he attended Nashville School of Law until 1993, at which time he graduated and passed the Tennessee Bar on his second attempt in February of 1994.

The Grosse report indicated a lack of cooperation from the Nashville School of Law in completing all of the forms re-

quested by the Board of Bar Examiners, supplying the requested information or allowing an on-site campus visit. That, in addition to the numerous deficiencies mentioned by Dean Grosse's report, makes it impossible for the Board to determine whether Brooks received an educational experience equivalent to that of a Kentucky Law School.

As noted by Dean Grosse's report, there are particular matters of concern:

A) The material submitted by the Nashville School of Law does not lead to a reasonable conclusion that the faculty at its institution is of the same high caliber as the Kentucky law schools, in education, classroom teaching ability, scholarly research and writing. The Board or its agents have not been permitted to observe any class at the Nashville Law School. There is no full-time faculty at Nashville; no seminars or small class experience is present, all as required by standards 16, 20, 21 and 22 of the ABA code.

B) There is no program for protecting and encouraging academic freedom and other conditions necessary to attract faculty of a substantial equivalency to Kentucky law schools. The faculty apparently plays no role in the government of the law school, including the development of curriculum as provided in standards 5, 6 and 21.

C) The school does not have a law library of any significance, library staff to assist students, nor can the Board find an adequate computer facility which would permit students to do legal research.

(D) There is no basis upon which to determine that the school broadens the legal education of its students by law related activity such as law review or moot court competition.

All of the problems arise because the Board was denied access to the Nashville School of Law, which makes it impossible to determine the adequacy of the facilities available. In addition, the school presented no financial information and refused to

do so upon specific request. Consequently, it is impossible to determine that the law school has ample resources to avoid financial pressure to accept less qualified students or to advance students on a year to year basis on merit and accomplishment alone. The materials supplied by Brooks as exhibits do not alter our view of the conclusions reached by the Board or the Grosse report.

We must agree with the conclusion reached by the Board of Bar Examiners and that of Dean Grosse, that the Nashville School of Law does not meet ABA standards or AALS standards and further is not a school which could be determined to be the substantial equivalent of a legal education program provided by approved law schools in Kentucky. Brooks has not met his burden of proving that the Nashville School of Law is the substantial equivalent of Kentucky law schools. Consequently, Troy Brooks does not meet the requirements of SCR 2.070(2)(a).

COOPER, JOHNSTONE, KELLER, STUMBO and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., files a separate concurring opinion in which COOPER and STUMBO, JJ., join.

GRAVES, J., dissents by separate opinion in which LAMBERT, C.J., joins.

Entered: February 24, 2000.

/s/ Joseph E. Lambert
Chief Justice

JOHNSTONE, Justice, concurring.

I concur in the majority opinion in its entirety, but write separately to address the baffling attack by the dissenting opinion upon the Kentucky Board of Bar Examiners and the American Bar Association. Perhaps the only statement in the dissent with which I can readily agree is that this matter involves the interpretation of SCR 2.070(2)(a). The rule still provides:

(2) An attorney who received a legal education in the United States but is not

eligible to sit for the examination by virtue of not having attended a law school approved by the American Bar Association or the Association of American Law Schools may nevertheless sit for the examination provided the attorney satisfies the following requirements:

(a) The attorney holds a J.D. Degree, which is not based on study by correspondence, from a **law school** accredited in the jurisdiction where it exists and **which requires the equivalent of a three-year course of study that is the substantial equivalent of the legal education provided by approved law schools located in Kentucky** . . . .

(Emphasis added).

From this opening by the dissent, the opinion proceeds on the flawed premise that the issue revolves around the *applicant*, not the law school. The dissent then degenerates to a searing attack on the standards applied by the ABA in the accreditation process for law schools. The dissent cites various law review articles, cases, and other materials, none of which are contained in the record of this matter, which purportedly provide the foundation for the dissent's primary hypothesis. According to the dissent, the ABA system of accreditation of law schools is a self-serving attempt to restrict entry into the legal profession of disadvantaged persons, inflate faculty salaries, increase the cost of a legal education, only to mention a few of the alleged nefarious motives harbored by the ABA.

The Kentucky Board of Bar Examiners is comprised of respected members of the bar who are appointed by this Court from each Supreme Court district. The Court delegates many responsibilities to the Board (see SCR 2.000, et seq.), one of which is the proper application of SCR 2.070(2) to applicants from non-accredited law schools who wish to sit for the Kentucky Bar Examination. In the matter before us, the Board engaged an expert to assist in the process of reviewing the Nashville School of Law, considered the expert's report as well as all other submitted materials, and in a thorough decision, submitted its opinion to the Court that the Board could not conclude that the Nashville School of Law provided the applicant with the "equivalent of a three-year course of study that is the substantial equivalent of the legal education provided by approved law schools located in Kentucky." As pointed out in the majority opinion, the lack of cooperation from the Nashville School of Law did not aid the applicant's request.

For its diligent attempt to carry out the responsibilities delegated by this Court, the Board is rewarded by the dissent's implication that the Board is in collusion with the ABA to accomplish its nefarious agenda. In my opinion, the Kentucky Bar Examiners deserve better.

I note in closing that the mandate of SCR 2.070(2) is the current policy of the Supreme Court of Kentucky. It was not imposed upon the judiciary or members of our bar by the American Bar Association, nor any other external force. If the better policy is to evaluate the *applicant* rather than the non-accredited law school, then we should change the rule. It makes little sense to criticize the body we charge with carrying out the policy for its painstaking effort to do so. The dissent's concession that the Nashville School of Law "espouses a fundamentally different approach to legal training" supports the conclusion of the Kentucky Board of Bar Examiners and the majority opinion. It is that simple.

COOPER and STUMBO, JJ., join this concurring opinion.

GRAVES, Justice, dissenting.

Respectfully, I must dissent.

This matter involves interpretation of SCR 2.070(2)(a) which provides:

(a) The attorney holds a J.D. Degree . . . from a law school accredited in the jurisdiction where it exists and which requires the equivalent of a three-year

course of study that is the substantial equivalent of the legal education provided by approved law schools located in Kentucky.

The qualifying words of art to be interpreted in this matter are "the substantial equivalent of the legal education provided by approved law schools located in Kentucky."

This rule was specifically developed and promulgated to assist a limited class of persons: graduates of law schools not accredited by the ABA, who nonetheless are able to provide sufficient indicia of professional competence to be allowed to sit for the Kentucky Bar examination. That is, it is only fair and just that they should be afforded the opportunity to have their competence examined and evaluated. Applicant Troy Brooks, for the reasons outlined below, falls squarely within the ambit of the rule.

The phrase "substantial equivalent of the legal education provided by approved law schools located in Kentucky" is reasonably interpreted to mean that the applicant has taken the same required courses as would be taken by a student at an ABA-accredited school, has spent an equivalent or comparable number of hours in the classroom, has used the same or comparable law school textbooks, has passed substantive law examinations of reasonably equivalent difficulty, and can pass a standardized bar exam. I contend that this reading is the one most logically consistent with the language and intent of the rule.

However, the Board of Bar Examiners sees otherwise. It has interpreted the phrase "substantial equivalent" to mean that the law school be comparable in resources, physical facilities, and faculty. The emphasis on these criteria, remarkably similar to the ABA standards to which the rule itself was intended to provide an alternative, may be a convenient way of disposing of Mr. Brooks' application, but fails entirely to address the ultimate and legitimate question: Is the graduate competent to sit for the Kentucky Bar examination? Substantially equivalent more rationally relates to the content of knowledge and skills acquired by the applicant wishing to sit for the bar examination.

The Kentucky Board of Bar Examiners engaged Consultant Jack Grosse, former Dean of Chase Law School, to evaluate the Nashville School of Law (NSL) pursuant to Mr. Brooks' application. Dean Grosse subsequently filed a report upon which the Board based its decision. Using ABA standards, Dean Grosse paints a substandard picture of NSL. Yet, by virtue of his dependancy on ABA standards, Dean Grosse's evaluation does not accord with the purpose or intent of the rule, nor does it fairly answer the question of whether Mr. Brooks received a "substantial[ly] equivalent" legal education, instead addressing only whether NSL possesses resources "substantially equivalent" to its accredited counterparts. To follow the Board's evaluation calculus would be to make SCR 2.070(2)(a) an absurd tautology, which provides merely that a graduate from a law school which has not met the ABA standards for accreditation, may still sit for the Kentucky Bar examination, provided he establishes that his school satisfies the ABA standards for accreditation. This internal inconsistency, apparently lost on the Kentucky Board of Bar Examiners, should not elude this Court lest the rule be a hollow one.

Lawyer competence, in most if not all areas of legal practice, demands a wide range of fundamental skills including the ability to:

—analyze legal problems;

—perform legal research;

—collect and sort facts;

—write effectively (both in general and in a variety of specialized applications such as pleadings, briefs, contracts or wills);

—communicate orally with effectiveness in a variety of settings;

—perform tasks calling on both communications and interpersonal skills, such as:
  (i) interviewing,
  (ii) counseling,
  (iii) negotiation;
—organize and manage legal work.

The report of former Dean Grosse simply does not address whether Troy Brooks has acquired any of these quantifiable and measurable skills, and thus it fails to satisfy the proper diagnostic function of SCR 2.070(2)(a). Like law school graduates from Vanderbilt University, University of Tennessee, and University of Memphis, Mr. Brooks has passed the same Tennessee Bar Examination. More importantly, he has successfully competed with graduates of hundreds of ABA-approved law schools in the Tennessee legal marketplace for more than five years. Under the Board of Bar Examiner's interpretation of SCR 2.070(2)(a), an accomplished NSL graduate practicing law successfully for years in Nashville, Tennessee, would never be qualified for law practice a few miles away in Scottsville, Kentucky. It is irrational to have such a geographical distinction.

A brief digression is instructive to demonstrate the incompatibility between the Board's reliance on the ABA standards in compiling its report and the intent of this Court in SCR 2.070(a)(2). Notably, the Board's reliance on the standards signals its underlying assumption that the goals of the ABA in accrediting schools are identical to those envisioned by this Court in SCR 2.070(2)(a), namely, protecting the public from incompetent or unscrupulous attorneys. This assumption is dubious at best. Recent anti-trust litigation against the ABA, and numerous learned articles, have drawn attention to what may be less than altruistic forces at play behind the closed doors of that august organization. *See* Complaint, *Massachusetts Sch. of Law v. American Bar Ass'n.*, No. 93–6206, at 1–2 (E.D.Pa.1993) (alleging that the ABA inflated faculty salaries, increased the cost of legal education, and prevented disadvantaged persons from obtaining a legal education). Many have joined in criticism of the ABA accreditation process, including the deans of fourteen law schools, incorporating Stanford, University of Chicago, and Harvard, who in an open letter to the deans of all accredited schools complained:

> We find the current process overly intrusive, inflexible, concerned with details not relevant to school quality (perhaps even at odds with maintaining quality), and terribly costly in administrative time as well as actual dollar costs to schools. It is this sense of responsibility that gives rise to our concern that the accreditation process for law schools is heading in the wrong direction. Our varied visions of legal education focus on the results of the educational process, on the outputs of legal education. In contrast, the ABA's accreditation process increasingly concentrates on the inputs—how many seats there are in the library, for example.

*An Open Letter to Deans of the A.B.A. Accredited Law Schools*, MSL L.Rev. Fall 1994, at 48, 49; *see generally* Andy Portinga, Note, *ABA Accreditation of Law Schools: An Anti–Trust Analysis*, 29 U.Mich.J.L.Ref. 635, 637 (1996). Additional questions about the ABA's primary motivations in accreditation were also raised when, following a yearlong investigation, the Department of Justice (DOJ) filed suit against the ABA for antitrust violations. A consent decree effectively ended the suit, but under it the ABA agreed to make numerous changes, including reconstituting the accreditation teams, previously comprised primarily of law professors. *Portinga, supra,* at 638. *Cf. Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (Court holding that despite state delegation of authority to bar associations, those associations are not immune from Sherman Act by state action). According to some, the degree of influence exerted by the ABA as gatekeeper to legal practice, evidenced by ABA

accreditation prerequisites for bar examinations in 45 states, provides a tremendous incentive for the organization to both exaggerate fears of "fly-by-night law schools cheating unwary students" and "unfit and crooked lawyers abusing hapless clients," and to misrepresent the efficacy of the accreditation system in warding against those evils. George B. Shepherd, William G. Shepherd, *Scholarly Restraints? ABA Accreditation and Legal Education,* 19 Cardozo L.Rev.2091, 2104 (1998).

Through decades of lobbying, the ABA has convinced most states to limit their bar examination to graduates of its accredited schools. Concern that the ABA system of accreditation may potentially be influenced by a self-serving attempt to restrict entry into the legal profession, or tainted by parties with vested interests in maintaining high costs for legal education, provides ample justification for a rule such as SCR 2.070(2)(a). The rule, properly applied, provides a valuable safeguard against possible abuses by refusing to abdicate entirely the gateway to legal practice in this state to an external, non-governmental body. Unfortunately, no meaningful distinction can exist where the state's own mechanism of regulation seems beholden, as it does in this case, to standards perpetuated by the ABA.

The report issued by the Kentucky Board of Bar Examiners casts its decision that NSL does not offer a "substantial equivalent" of an approved Kentucky school by cataloging a score of ABA standards that, the Board alleges, the school fails to satisfy. These focus, almost without exception, on physical resources, administration, and faculty schedules. While these are important considerations for a student in selecting which school to attend, they are not necessarily probative of the substance of the education offered therein. Were Yale University to offer classes to interested students in a dank and moldy off-campus basement, and with a qualified part-time professor, I still strongly suspect that a motivated student could find an excellent education there. This possibility is virtually unimaginable according to the ABA paradigm, a paradigm which also, incidently, would have left Chief Justice John Marshall and countless other venerable jurists in our nation's history out of work.

The "non-ABA" evaluation section of the Board's report offers little more than a rewording and reprise of the ABA-based evaluation textually preceding it. Again, the focus is on a lack of full-time faculty, resources, and elective offerings. The report concedes that many matters pertinent to assessment could not be addressed without an on-site visit. Curiously, a cursory review of the materials provided by NSL (upon which Dean Grosse presumably based his evaluation) suggests answers to several of the questions the report left unresolved. For example, Dean Grosse's speculation that NSL graduates fall short of the 1120 class hours required by the ABA, reveals an apparent unwillingness to do the necessary arithmetic. In fact, the NSL course catalogue indicates that in order to graduate, NSL students must complete a combination of twenty-four (24) required courses in classes of 22, 45, 65, 79, and 101 classroom hour increments, or, simply put, exactly 1120 hours of mandatory classes. These hours can then be supplemented by additional elective courses. Obviously, the required courses alone satisfy the ABA requirements, and even absent elective undertakings, the class hours are consistent with the requirements of many ABA-accredited institutions.

"Substantially equivalent" does not mean "identical." In this context it means having the capacity to produce the same result, namely a competent lawyer. There are, no doubt, many perceived inadequacies in the educational opportunities available at NSL when contrasted with institutions meeting the standards set by the American Bar Association, just as a continuum of advantages exist across ABA-accredited schools. NSL does not offer the

elective course selection available at many schools; the law library is not extensive; there is no law review providing scholarly research and writing opportunities; the faculty is not engaged full-time in teaching or writing for scholarly journals; and student support services are not comprehensive. These, and perhaps other circumstances, will prevent a school such as NSL from ever being recognized as a great or distinguished school of law. Yet, this relative educational adversity must not, in an ostensibly meritocractic profession, constitute an impregnable barrier for the particularly self-motivated and tenacious student willing to work hard to acquire a solid legal education. I have no doubt that a student willing and able to surmount the deficiencies of such an environment can obtain, at least, a substantially equivalent education to that which all but the most academically inclined students receive at more distinguished law schools. Nor do I doubt that, by the same token, a tremendously expensive Ivy-league legal education can be frittered away by a student unwilling to truly earn it.

Additionally, it behooves this Court to remember, in assessing the probative value of the ABA standards as applied to a "substantial equivalen[cy]" analysis, that the opportunities vaunted in the accreditation process are, for the most part, available to a very limited number of students. The vast majority of graduates from ABA-accredited schools will not benefit from small group seminars, law reviews, clinical experience, and research assistance to faculty members. Seeing as most schools can provide these benefits to only a small subset of their students, usually the brightest and the luckiest, it seems counterintuitive to suggest that a school without them, by definition, is under-equipped to educate its student body.

NSL, in contrast, espouses a fundamentally different approach to legal training and serves a largely non-traditional student body. Practically all of the students at NSL are attending the four (4) year night program because they are gainfully employed. Many of them are simply unable, due to familial or other constraints, to forego three years income, and resign themselves to the albatross of debt that increasingly adorns the necks of the modern American law student. It is my understanding that many NSL students have jobs while in school that involve legal research, writing, and contact with the legal profession. They participate in moot court, both trial and appellate, which requires research and writing outside of the regular classroom work and provides "practical" training. The volumes in the NSL library are supplemented by computer research facilities and the availability of other law libraries in the area. The faculty members of NSL, while less published in academic journals and treatises, tend to do their research and writing for actual clients, or, in the case of members of the judiciary, for their courts. I have ample reason to believe that they take their teaching responsibilities seriously and that their status as part-time faculty is a reflection on the non-traditional composition and orientation of the school, not on the quality of their instruction. In the materials provided the Board by NSL, twenty-three of the thirty-four well-credentialed professors were reported to have been with the school for 10 years or longer. The majority of them are drawn from the ranks of legal professionals, including judges and prominent attorneys, and to suggest that they have less to impart than full-time academics reveals the bias inherent in the ABA standards.

NSL provides an affordable, practicum-oriented alternative for the study and practice of law. While some ABA-accredited schools expressly eschew practical legal instruction in favor of its sublimated, abstract forms, NSL offers a nuts and bolts approach to the mechanics of the law affordably. It does not have the resources for courses on defending baby seals in court, surfing pornography web sites, or entertainment law focusing on lotteries

and gambling. Rebecca Luczydki, *Roll Over Socrates, Unusual Law Courses on the Rise,* The Nat'l Jurist, Nov. 1999 at 13.

In law school, I acquired skills in analysis, research, and communication. However, my finest instructor was not a professor but rather the late Francis T. Goheen, with whom I started law practice in 1964. Further, three years of law school did not compare in educational value with the understanding of law which matured during my one year clerkship with this Court. The practice of law is so necessarily broad that no one system of teaching it, neither Dean Langdell's nor Dean Loser's, has yet been developed that adequately encompasses all of its facets. Until such a system is perfected, legal academics and professionals truly interested in fairness and excellence, would be advised to honestly assess new models of imparting legal knowledge.

Apparently, Troy L. Brooks was a good, but not exceptional, student and it seems unlikely that he would have been afforded the opportunities provided by law review, practice clinics, etc., had he attended an accredited institution. Like many "B" students at accredited schools, these opportunities would likely have eluded Mr. Brooks. Though NSL offers a relatively inexpensive program geared toward working people who may not have the luxury of a traditional legal education, it could not do so for long were it forced to adopt the costly trappings so seemingly inseparable from ABA accreditation.

It is debatable whether the faculty, library facilities and extra-curricula programs that exist at Kentucky law schools generally provide a more effective legal education than is offered by NSL. Graduates of NSL do have a substantially lower bar examination passage rate than Kentucky graduates and this is noteworthy. However, should the future of select, highly-motivated but disadvantaged students be evaluated on aspects of their schools not clearly correlated to acquiring a satisfactory legal education, or should these graduates be considered on other criteria reflective of their personal merit? In order for SCR 2.070(2)(a) to have any discernible distinction from the law that preceded it, the latter approach must be followed. Substantial equivalency must be divined from the quality of the respective student's knowledge, not the institution's amenities. To do otherwise is to unfairly deprive worthy students, who for a variety of reasons must opt for a non-traditional legal education, of the opportunity to practice law in Kentucky.

A rigorous Bar examination is but one screen to protect the legal consumer; numerous other informal and, arguably, more effective safeguards exist which are constantly shaping the composition of the legal profession. Market forces, including obtaining and retaining employment, financing a practice and building a satisfactory reputation, together with means of legal redress [1] against unworthy lawyers, all operate to weed out bad seeds. *See* Christopher T. Cunniffe, *The Case for the Alternative Third–Year Program,* 61 Alb. L.Rev. 85 (1997). Therefore, given the extra protections in place, I can see no principled reason why this Court should stand idly by while an influential professional organization imposes, with the complicity of the state bar examiners, another patently suspect restriction.

The ABA has had too much control over decisions affecting access to the study of law. As a result, the dominant model of American legal education has become one in which students are taught how to argue aggressively, with no quarter given or taken, and how to fight an opposing viewpoint with uncompromising technical skill. Fewer than 4% of American law schools require their students to take even one hour of training in negotiation as part of their learned skills.

As I favor a more relative open access to the bar, I would afford the applicant an

---

1. For example, malpractice actions; ethics reviews; criminal sanctions.

opportunity to take the Kentucky Bar Examination.

LAMBERT, C.J., joins this dissent.