Cite as 2024 Ark. 90

# SUPREME COURT OF ARKANSAS
No. CV–22–190

| | |
|---|---|
| JOHN THURSTON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF THE STATE OF ARKANSAS; SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, AND J. HARMON SMITH, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE ARKANSAS STATE BOARD OF ELECTION COMMISSIONERS<br><br>APPELLANTS<br><br>V.<br><br>THE LEAGUE OF WOMEN VOTERS OF ARKANSAS; ARKANSAS UNITED; DORTHA DUNLAP; LEON KAPLAN; NELL MATTHEWS MOCK; JEFFERY RUST; AND PATSY WATKINS<br><br>APPELLEES | Opinion Delivered: May 16, 2024<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-21-3138]<br><br>HONORABLE WENDELL GRIFFEN, JUDGE<br><br>REVERSED AND DISMISSED. |

**CODY HILAND, Associate Justice**

The 93rd Session of the Arkansas General Assembly passed a number of acts regarding

the election process. The League of Women Voters of Arkansas, et al.[1] (Appellees), brought

---

[1]Arkansas United; Dortha Dunlap; Nell Matthews Mock; Jeffery Rust; Patsy Watkins; and Leon Kaplan join as appellees.

a challenge to four of those acts – Acts 736, 973, 249, and 728 of 2021 (the Acts). The circuit court held them unconstitutional and permanently enjoined their operation and enforcement. John Thurston, in his official capacity as Secretary of State for the State of Arkansas, along with members of the Arkansas State Board of Election Commissioners[2] (Appellants) appeal. We hold that the Acts are not clearly incompatible with the sections of the Arkansas Constitution as alleged by Appellees; thus, we reverse and dismiss.

I. *Brief Summary of the Acts*

For assistance in understanding the claims, below is a synopsis of the four Acts relating to the constitutional challenges raised by the Appellees.

A. Act 736

Arkansas law has long required county clerks to verify that the voter's signature on an absentee-ballot application is "similar" to the signature on that voter's registration. Act 736 retained the requirement that the signature be verified and further clarified that clerks must use the voter's registration "application" as opposed to the voter's registration "records" to conduct that verification.[3]

B. Act 973

As a method of absentee voting, Arkansas law allows for the in-person delivery of an absentee ballot by the voter. This method was retained; Act 973 moved the deadline for in-

---

[2]Sharon Brooks, Bilenda Harris-Ritter, William Luther, Charles Roberts, James Sharp, and J. Harmon Smith join as appellants in their official capacity as members of the Board.

[3]*See* Ark. Code Ann. § 7-5-404(a)(1)(B) & (2)(A) (Supp. 2023).

person ballot delivery back one business day—from the Monday before election day to the preceding Friday by close of business of the county clerk's office.[4]

## C. Act 249

The Arkansas Constitution requires a voter to present valid photographic identification to cast a ballot.[5] Before Act 249, voters who failed to present appropriate identification could complete a sworn statement ("affidavit fail-safe") indicating that they were registered to vote. Act 249 eliminated that alternative. Now, voters who cast provisional ballots must provide photo identification to the county board of election commissioners or the clerk "by 12:00 noon on the Monday following the election" for their vote to be counted.[6]

## D. Act 728

Arkansas law penalizes voting-related offenses designed to unfairly influence the way in which an individual might vote. Act 728 added one action to the list of prohibited election activities. Now, "a person shall not enter or remain in an area within one hundred feet (100′) of the primary exterior entrance to a building where voting is taking place except for a person entering or leaving a building where voting is taking place for lawful purposes."[7]

---

[4] *See* Ark. Code Ann. § 7–5–411(a)(1)(C) & (D) (Supp. 2023).

[5] *See* Ark. Const. amend. 99, § 1, proposed by Acts of 2017, H.J.R. 1016, § 1, approved at Nov. 6, 2018, election that amended Ark. Const. art. 3, § 1.

[6] *See* Ark. Const. amend. 51, § 13.

[7] *See* Ark. Code Ann. § 7–1–103(a)(24) (Supp. 2023).

II. *Procedural History*

After the General Assembly passed the four Acts in the spring of 2021,[8] Appellees filed suit in circuit court for injunctive and declaratory relief alleging that the Acts violated various provisions of the Arkansas Constitution and would burden lawful, eligible voters in the exercise of their right to vote.[9] Specifically, Appellees argued that (1) Act 736 would make it substantially harder for voters to obtain an absentee ballot by making the signature-matching process more unreliable and error-prone, thereby disenfranchising voters properly entitled to absentee ballots; (2) Act 973 would disenfranchise voters without reasonable justification by shortening the deadline for voters to return absentee ballots in person; (3) Act 249 would disenfranchise voters who do not have acceptable photographic identification by enacting a strict voter-identification requirement; and (4) Act 728 is unnecessarily vague and would impede nonpartisan voter-support activities by excluding nonvoters from providing support to voters waiting in line.[10] Appellees further argued that both Act 736 and Act 973 violate the equal protection clause, the free and equal election clause, and the voter qualifications clause of the Arkansas Constitution; that Act 249 violates the equal protection clause, the free and equal election clause, and amendment 51, section

---

[8]Act 736 was approved April 15, 2021; Act 973 was approved April 27, 2021; Act 249 was approved March 3, 2021; and Act 728 was approved April 15, 2021. The effective date for all four Acts was July 28, 2021.

[9]Appellees' initial complaint was filed May 19, 2021, and their amended complaint was filed July 1, 2021—*before* the Acts took effect.

[10]More specifically, Appellees argue Act 728 will prohibit organizations from providing free water bottles or snacks while voters are "forced to wait in unreasonably long lines."

4

19 of the Arkansas Constitution; and that Act 728 violates the equal protection clause, the free and equal election clause, and the free speech and free assembly clauses of the Arkansas Constitution.[11] In response, Appellants argued that the Acts were enacted to advance the compelling governmental interests of protecting the integrity of Arkansas elections by preventing fraudulent voting and to promote public confidence in election security.

Before reaching the merits of the constitutional claims, Appellants filed a motion to dismiss claiming sovereign immunity barred the suit. On November 1, 2021, after conducting a hearing on the matter, the circuit court entered a written order in favor of the Appellees. In response, Appellants filed an interlocutory appeal with this court based on the circuit court's denial of their motion, and this court affirmed on February 17, 2022.[12]

Upon the resumption of the case, the circuit court held a hearing and entered an order striking down all four of the Acts as violating the Arkansas Constitution and permanently enjoined their enforcement. Throughout its strict-scrutiny analysis, the circuit court relied on the "fundamental right to vote" as the legal basis for its findings, stating the Acts failed to advance a compelling government interest or that the Acts were the least-restrictive infringement on the rights guaranteed by the Arkansas Constitution. Appellants also sought an emergency stay of the injunction, which we granted. We now consider the constitutionality of the Acts that the circuit court invalidated. This court has jurisdiction pursuant to Ark. Sup. Ct. R. 1–2(a)(1) (appeals involving the interpretation or construction

---

[11]It is important to note that the Appellees' complaint alleges violations of the Arkansas Constitution *only*, not the United States Constitution.

[12]*Thurston v. League of Women Voters of Arkansas*, 2022 Ark. 32, 639 S.W.3d 319.

of the Constitution of Arkansas) and (a)(4) (appeals pertaining to elections and election procedures).

### III. *Legal Analysis*

Our standard of review of a circuit court's ruling on the constitutionality of an act is clear. This court reviews a circuit court's interpretation of the constitution de novo because it is for this court to determine what a constitutional provision means. *Chandler v. Martin ex rel. State*, 2014 Ark. 219, 433 S.W.3d 884. Acts of the legislature are presumed constitutional, and the party challenging the statute has the burden of proving otherwise. *Archer v. Sigma Tau Gamma Alpha Epsilon, Inc.*, 2010 Ark. 8, 362 S.W.3d 303. An act will be struck down only when there is a clear incompatibility between the act and the constitution. *Bakalekos v. Furlow*, 2011 Ark. 505, 410 S.W.3d 564.

Before reaching our analysis, we address the fundamental right to vote. "The right to vote is the right to participate in an electoral process that is *necessarily structured* to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (emphasis added). Thus, while the right *to vote* has been held to be fundamental, the right to vote *in a particular manner* is not guaranteed.

As many courts have noted, absentee voting is not a fundamental right. *See, e.g.*, *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.New Hampshire 2018). Even the United States Supreme Court has concluded restrictions on absentee voting do not deny voters "the exercise of the franchise." *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969). Similarly, there is no fundamental right to vote by affidavit, rather than by photo

6

identification, such that strict scrutiny should automatically be applied. *See, e.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008).

Upon examination of the plain language of the Acts, it is clear the fundamental right to vote is not at stake here; thus, the State was not required to prove a compelling state interest. *See Jegley v. Picado*, 349 Ark. 600, 632, 80 S.W.3d 332, 350 (2002) ("When a statute infringes upon a fundamental right, it cannot survive unless a compelling state interest is advanced by the statute and the statute is the least restrictive method available to carry out the state interest."). The circuit court's conclusion that strict scrutiny applied across the board to these four Acts was an error of law.

Nonetheless, we must examine the Acts under the Arkansas constitutional provisions on which they were challenged and invalidated.

## A. Equal Protection

The equal protection clause of the Arkansas Constitution can be found in article 2, section 3 and states: "The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity; nor exempted from any burden or duty, on account of race, color or previous condition."[13]

In deciding whether an equal-protection challenge is warranted, there must first be a determination that there is a state action that differentiates among individuals. *Ghegan & Ghegan, Inc. v. Barclay*, 345 Ark. 514, 521, 49 S.W.3d 652, 656 (2001). So, the first question

---

[13]Ark. Const. art. 2, § 3.

7

that *must* be asked is "what is the government's classification?"—that is, how is the government drawing a distinction among people?

There are two ways to prove the existence of a classification: (1) showing that a distinction exists on the face of the law; or (2) by demonstrating that a facially neutral law has a discriminatory impact and a discriminatory purpose. *Only* once equal protection is invoked [by determining that a classification exists] must we determine what standard of analysis applies. *Bosworth v. Pledger*, 305 Ark. 598, 604, 810 S.W.2d 918, 920-21 (1991) (emphasis added).

When the language of the challenged provision contains no classification of any kind and has a similar effect on all persons similarly situated, it cannot deny equal protection. *See Quinn-Moore v. Lambert*, 272 Ark. 324, 330, 614 S.W.2d 230 (1981). "Almost every constitutional provision has indirect consequences that may affect different persons in different ways, but there is no denial of equal protection unless the constitutional provision itself embodies an unreasonable classification." *Id.*

First, the Acts are neutral on their face. Next, to the extent Appellees tried to prove a discriminatory impact or purpose, the evidence fell short. The laws were not yet in effect at the time of their challenge.[14] And while Appellees put on a myriad of witnesses to testify as to what they believed will be the *potential* discriminatory impact in application, the evidence provided was only speculative. Because the Acts are facially neutral and do not contain any discriminatory classes, equal protection was not invoked.

---

[14]*See Brown v. State*, 2015 Ark. 16, at 6–7, 454 S.W.3d 226, 231.

Upon our de novo review, the circuit court improperly engaged in an equal-protection analysis of all four Acts. The circuit court concluded Act 736 violated equal-protection—namely, by making it easier to disenfranchise the elderly, the illiterate, and those with poor penmanship. However, this Act created no distinction between old voters and young voters; voters with bad handwriting and those with good handwriting; or between those who can read and those who can't. All absentee voters are treated the same under the plain terms of the Act. Because it is facially neutral and does not contain a discriminatory classification on its face, the equal-protection challenge to Act 736 fails.[15]

The circuit court concluded Act 973 violated equal protection because the Act provided "no administrative benefit" and because a "change to the deadline *may* confuse voters." Yet there is no evidence that an absentee ballot was not counted for failure to timely deliver. Just as with Act 736, it is facially neutral and did not contain a discriminatory classification on its face, so the equal-protection analysis should have concluded.

As it relates to Act 249, the circuit court found that it violated equal protection because it would suppress Arkansas voters "who lack the means, time, or wealth required to procure a compliant photo [identification]." However, because the Act itself is facially neutral and draws no classifications since it does not distinguish between those with means to obtain valid identification and those that do not, the circuit court, yet again, incorrectly ruled as a matter of law on a facial challenge and relied on speculation of a *potential* future

---

[15]There was no evidence that any voters' absentee ballots had been rejected because of an unmatched signature; thus, it was improper for the circuit court to rely on the same as proof of a discriminatory impact.

discriminatory impact on those with reduced financial means. In his concurring opinion on another state's similar law requiring photo identification, Justice Scalia stated: "a voter complaining about such a law's effect on him has no valid equal-protection claim because, without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional."[16]

Finally, regarding Act 728, the circuit court's order is entirely devoid of the path taken to reach its conclusion that this law violated the equal protection clause. Be that as it may, as discussed above, an equal-protection analysis is not triggered until it can be established that the government has created a classification or distinction among people. Because this Act, just as the three above, applies equally to every qualified voter, it is unnecessary to further examine the asserted challenge.

In light of the foregoing, because each of the Acts is facially neutral and a classification was not, and cannot be, determined for any of the Acts, the equal protection clause was not implicated. The circuit court's conclusion that the Acts violated article 2, section 3 of the Arkansas Constitution was incorrect as a matter of law. We reverse.

B. Free and Equal Elections

The Arkansas Constitution's free and equal election clause, found in article 3, section 2, states: "Elections shall be free and equal. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage; nor shall any law be enacted whereby

---

[16]*Crawford*, 553 U.S. 181, 207 (2008) (Scalia, J., concurring).

such right shall be impaired or forfeited, except for the commission of a felony, upon lawful conviction thereof."[17]

A free and equal election in Arkansas has long been understood to be one in which qualified voters can vote in accordance with rules and processes established by the legislature. While the clause constrains the General Assembly's ability to disqualify otherwise qualified voters, it does not limit the General Assembly's ability to ensure open and honest elections.

Historically speaking, this court has interpreted this provision narrowly as a protection against "fraud and [voter] intimidation." *Patton v. Coates*, 41 Ark. 111, 126 (1883). A qualified voter, pursuant to this clause, is ensured the ability to exercise the right to vote free from outside influence. In 1953, this court framed the rights afforded under this clause as follows:

> By declaring that elections shall be free and equal, the constitutional guaranty is not only that 'the voter shall not be physically restrained in the exercise of his right by either civil or military authority' but it is that by no intimidation, threat, improper influence, or coercion of any kind shall the right be interfered with. The test of the constitutional freedom of elections is the freedom of the elector to deposit his vote as the expression of his own unfettered will, guided only by his own conscience, as he may have had it properly enlightened. Each individual voter as he enters the booth is given an opportunity to freely express his will, with no one by him to influence or intimidate him, and from the face of the ballot he is instructed how to mark it. This is the right given to every elector, and therefore is an equal one.

*Davidson v. Rhea*, 221 Ark. 885, 888, 256 S.W.2d 744, 746 (1953).

The focus of this provision is the certainty of the election itself. It ensures that the outcome reflects the will of the voting majority. *Whitley v. Cranford*, 354 Ark. 253, 260, 119

---

[17]Ark. Const. art. 3, § 2.

11

S.W.3d 28, 32 (2003). Generally, the remedy for a violation of this sort is to void an election. *Id.* Thus, the remedial focus of the free and equal election clause is postelection—as it will allow a court to void an election when "the result was rendered uncertain by fraud and intimidation" or "where the voters have received insufficient notice." *Id.*

Unless the specific language of the challenged Act implicates the rights afforded under the free and equal election clause, we need not decide whether the Act had a rational basis or whether it survives strict scrutiny. With this in mind, we now turn to the Acts.

In its order, the circuit court made a conclusory finding that each Act violated the free and equal election clause but failed to conduct the requisite analysis. Article 3, section 2, is not implicated by laws regulating the manner and method of absentee voting as Act 736 and Act 973 are. Similarly, the free and equal election clause says nothing about a photo identification requirement as indicated by Act 249. Last, regarding Act 728, the circuit court's finding that the Act violated this provision of the constitution is particularly perplexing. If anything, the anti-influence prohibition of this Act seems to promote the purpose of the free and equal election clause, not violate it.

In any event, there is no precedent requiring the application of this provision of the constitution to a pre-enforcement election law challenge. Article 3, section 2, of the Arkansas Constitution does *not* confer a constitutionally protected right to absentee voting, voting without identification, or the right to "support" while waiting in line to vote, as the circuit court's finding so indicates. As it is for this court to determine the meaning of a constitutional provision, we hold that the circuit court erred as a matter of law when it not only subjected the Acts to a strict scrutiny analysis, but in its peculiar finding that the Acts

12

violated the free and equal election clause. Accordingly, we reverse any legal finding to the contrary.

## C. Voter Qualifications

Except as otherwise provided by the Arkansas Constitution, any person may vote in an election in the State of Arkansas who is (1) a citizen of the United States; (2) a resident of Arkansas; (3) at least eighteen years of age; and (4) lawfully registered to vote in the election.[18] Further, amendment 99 provided that the General Assembly shall provide by law that a voter shall present valid photographic identification before receiving a ballot to vote in person and enclose a copy of valid photographic identification with the ballot when voting absentee.[19]

This court has held that the General Assembly may not add voter qualifications beyond those contained in article 3, section 1. *See Martin v. Kohls*, 2014 Ark. 427, 444 S.W.3d 844. Thus, the question here becomes, did the language of Act 736 or Act 973 establish additional qualifications a person must meet before becoming eligible to vote in the State of Arkansas?

The circuit court summarily found, without explanation, that both Act 736 and Act 973 violated the voter qualification clause of the Arkansas Constitution. As addressed above repeatedly, both Act 736 and Act 973 amended the law regarding the mechanics of absentee voting. They do not, however, impose additional qualifications beyond those in the constitution. Neither matching an absentee voter's signature nor setting a deadline for

---

[18]Ark. Const. art. 3, § 1(a).

[19]Ark. Const. art. 3, § 1(b).

absentee ballot delivery alters *who* is qualified to vote. Further, to the extent there was any doubt that regulations related to the method of voting do not implicate the voter qualification clause, amendment 99 resolved any potential uncertainty. Subsection (f) provides that "[a] voter meeting the requirements of this section also shall comply with all additional laws regulating elections necessary for his or her vote to be counted."[20] Thus, the constitution itself explicitly recognizes that election regulations requiring compliance are not additional voter qualifications.[21] Accordingly, we must reverse.

## D. Amendment 51, Section 19

The circuit court, yet again without legal rationale, inexplicably found that Act 249 violated amendment 51, section 19 of the Arkansas Constitution, which provides a comprehensive regulatory scheme governing the registration of voters.[22] "The General Assembly may, in the same manner as required for amendment of laws initiated by the people, amend Sections 5 through 15 of this amendment, so long as such amendments are germane to this amendment, and consistent with its policy and purposes."[23]

Invoking that power, the General Assembly passed Act 633 of 2017, which amended amendment 51 to require Arkansas voters to provide verification of voter registration in the form of either photo identification or via a signed sworn statement (affidavit fail-safe). In

---

[20]Ark. Const. art. 3, § 1(f).

[21]*See Gatzke v. Weiss*, 375 Ark. 207, 211, 289 S.W.3d 455, 458 (2008) ("The Arkansas Constitution must be considered as whole, and every provision must be read in light of other provisions relating to the same subject matter.").

[22]*See Martin*, 2014 Ark. 427, 444 S.W.3d 844.

[23]Ark. Const. amend. 51, § 19.

upholding the constitutionality of that law, this court stated, in pertinent part, the following:

> Germane means "[r]elevant; pertinent," or "having a close relationship." In essence, whether an amendment is relevant, pertinent, or bears a close relationship to Amendment 51 turns on the subject matter and scope of Amendment 51. In our view, providing a system of verifying that a person attempting to cast a ballot is registered to vote is relevant and pertinent, or has a close relationship, to an amendment establishing a system of voter registration. We hold that verifying voter registration as set out in Act 633 is germane to Amendment 51.
>
> Amendment 51's stated purpose is to "establish a system of permanent personal registration as a means of determining that all who cast ballots in elections are legally qualified to vote in such elections.
>
> [S]ection 3 of Amendment 51 provides: "No person shall vote or be permitted to vote in any election unless registered in a manner provided for by this amendment." Thus, the amendment itself contemplates some enforcement mechanism, and Act 633 provides a method of ensuring that no person is permitted to vote who is not registered. Providing a method of enforcement is consistent with the policy and purpose of Amendment 51.

*Martin v. Haas*, 2018 Ark. 283, at 11–12, 556 S.W.3d 509. (internal citations omitted).

Here, Act 249 continues to serve the same purpose as the law in *Haas*—it provides a way for poll workers to ensure that the person voting is the person who has registered to vote. The mere fact that the act removed the alternative of an affidavit to the voter identification requirement does not make Act 249 inconsistent with this specific Amendment, or with the other provisions of the Arkansas Constitution, especially in light of Amendment 99. As stated *supra*, the constitution requires a voter to provide valid photographic identification.[24] And while the constitution says the legislature "may" pass laws providing for exceptions to this requirement, because this language is permissive, the

---

[24]Ark. Const. art. 3, § 1(b)(1)(A).

legislature may choose, as it has done here, to eliminate any exceptions.[25] Thus, because Act 249 is germane to Amendment 51 and consistent with its policy and purpose, it is therefore constitutional. We reverse.

## E. Free Speech and Free Assembly

For its final finding, the circuit court concluded Act 728 violated the right to freedom of speech and assembly because "there is no law in Arkansas against being within 100 feet . . . of a polling location and handing out bottled water, providing comfort to persons who are waiting to enter the polling location, or engaging in other lawful conduct" and because Appellants presented "no evidence that giving water and other comfort to persons waiting to enter polling places caused disruptions."

Appellees' attack, again, amounts to a facial challenge, but this time, to a statute criminalizing activity under Arkansas' first amendment provisions.[26] But one cannot challenge a statute "on the ground that it may conceivably be applied in hypothetical situations not before the court." *Bailey v. State*, 334 Ark. 43, 54, 972 S.W.2d 239, 245 (1998). An appellant may challenge a law as being facially invalid only if he shows that the application of the law will restrict first amendment rights. *Id.* "The mere fact that [a legislative] Act might operate unconstitutionally under some conceivable circumstances is insufficient to render it wholly invalid." *Id.*[27]

---

[25]*Id.* § (e)(2).

[26]Ark. Const. art. 2, §§ 4 & 6.

[27]At this time, there is no evidence that any activity protected by the First Amendment has been burdened, but that does not prevent future as–applied challenges.

16

Here, the circuit court made no attempt to grapple with the blackletter law that the First Amendment allows time, place, and manner restrictions on speech, so long as the restriction is content neutral, narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. *United States v. Grace*, 461 U.S. 171, 177 (1983). "In general, it may be said that the State may place reasonable time, place, and manner restrictions on speech that takes place in a public forum." *Hodges v. Gray*, 321 Ark. 7, 17, 901 S.W.2d 1, 6 (1995). Further, considering the United States Supreme Court has upheld a content-based restriction on speech within one hundred feet of a polling place under strict scrutiny, we conclude this content-neutral law—Act 728—easily satisfies a first amendment challenge, especially at the facial-challenge stage. *See Burson v. Freeman*, 504 U.S. 191, 211 (1992).

Given the procedural posture of Appellees' argument constituting a facial challenge, and because we cannot say there is a clear incompatibility between the Act and the constitution, it was thus improper for this Act to be struck as unconstitutional.

Reversed and dismissed.

KEMP, C.J., and WOMACK and WEBB, JJ., concur.

**SHAWN A. WOMACK, Justice, concurring.** I agree with the majority's decision to reverse the circuit court's order in its entirety and dismiss the case. Yet I write separately because, consistent with my position in the first iteration of this appeal, *Thurston v. League of Women Voters of Ark.*, I would base the disposition solely on article 5, section 20 of the

Arkansas Constitution.[1] Absent an express constitutional provision to the contrary, the State can never properly be a defendant in any of its courts.[2] Because there is not an applicable constitutional carve-out for the underlying suit that named the State as a defendant here, the circuit court's order must be reversed and the case dismissed.

For these reasons, I respectfully concur.

**BARBARA W. WEBB, Justice, concurring.** I concur that this case should be reversed and dismissed. I agree with the appellants' argument that the circuit court's error can be attributed to its erroneous application of strict scrutiny in evaluating the constitutionality of four statutes that the General Assembly passed to promote election integrity.

The threshold issue in this appeal is whether the circuit court incorrectly applied strict scrutiny where the challenged acts only involved election regulations and thus did not implicate a fundamental right warranting strict scrutiny. *Citing McDaniel v. Spencer*, 2015 Ark. 94, at 9, 457 S.W.3d 641, 650 (applying rational basis in the initiative-and-referendum context); and *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 271, 872 S.W.2d 349, 360 (1994), appellants urge us to reaffirm that ordinary election regulations warrant only rational-basis scrutiny. This argument is compelling.

In *U.S. Term Limits, Inc.*, *supra*, we relied on the Supreme Court case, *Burdick v. Takushi*, which stated:

---

[1]*See Thurston v. League of Women Voters of Ark.*, 2022 Ark. 32, at 17, 639 S.W.3d 319, 327 (Womack, J., dissenting).

[2]*Id*.

18

It is beyond cavil that "voting is of the most fundamental significance under our constitutional structure." *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986). The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. *Sugarman v. Dougall*, 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986). Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974).

Since at least *U.S. Term Limits, Inc.*, Arkansas has accepted the fundamental dichotomy between the right to vote and reasonable regulation of elections. The former is subject to strict scrutiny, while the latter is subject to rational basis scrutiny. We similarly used this standard in another election-law case, *Spencer, supra*, when we employed rational basis scrutiny to evaluate regulations that pertain to a textual constitutional right. The *Spencer* court described the rational–basis standard as follows:

The equal-protection clause permits classifications that have a rational basis and are reasonably related to a legitimate government purpose. *Bakalekos v. Furlow*, 2011 Ark. 505, at 12, 410 S.W.3d 564, 573. Equal protection does not require that persons be dealt with identically; it requires only that classification rest on real and not feigned differences, that the distinctions have some relevance to the purpose for which the classification is made, and that their treatment be not so disparate as to be arbitrary. *Id*. If a rational basis exists, the statute or, in this case, the regulation, will withstand constitutional challenge. *Id*.

19

In our de novo review of the challenged acts using rational basis scrutiny there can be no doubt as to their constitutionality. Because the League of Women Voters alleged that the four challenged Acts violated various provisions to the Arkansas Constitution and these challenged Acts do not implicate a fundamental right, I would hold that the challenged Acts survive constitutional scrutiny under a rational basis standard. *See McDaniels*, *supra*; *see also U.S. Term Limits*, *supra*.

I respectfully concur.

KEMP, C.J., joins.

*Tim Griffin*, Att'y Gen., by: *Nicholas J. Bronni*, Solicitor Gen.; and *Dylan L. Jacobs*, Dep. Solicitor Gen., for appellants.

*Kutak Rock LLP*, by: *Jess Askew III* and *McKenzie L. Raub*, for appellees; *Perkins Coie LLP*, by: *Kevin J. Hamilton*, pro hac vice, for appellee League of Women Voters of Arkansas; *Elias Law Group LLP*, by: *Elisabeth Frost* and *Alexi M. Velez*, pro hac vice, for appellees Arkansas United, Dortha Jeffers Dunlap, Leon Kaplan, Nell Matthews Mock, Jeffery Rush, and Patsy Watkins.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*; *Holtzman Vogel Baran Torchinsky & Josefiak, PLLC*, by: *Jason B. Torchinsky* and *Mateo Forero-Norena*, for Honest Elections Project, as amicus curiae on behalf of the appellants.