In re: **Richard O. LEWIS**

No. 2002–SC–0236–OA.

Supreme Court of Kentucky.

Oct. 17, 2002.

## OPINION AND ORDER

Once again, we are called upon to interpret the meaning of SCR 2.014(2)(a) and its application to an applicant for admission to the Kentucky Bar Association who did not graduate from a nationally accredited law school. The rule provides as follows:

(2) An attorney who received a legal education in the United States but is not eligible for admission by virtue of not having attended a law school approved by the American Bar Association or the Association of American Law Schools may nevertheless be considered for admission by examination provided the attorney satisfies the following requirements:

(a) The attorney holds a J.D. Degree, which is not based on study by correspondence, from *a law school* accredited in the jurisdiction where it exists and *which requires the equivalent of a three-year course of study that is the substantial equivalent of the legal education* provided by approved law schools located in Kentucky. The applicant shall bear the cost of evaluation of his/her legal education, as determined by the Board, and the application shall not be processed until the applicant's legal education is approved by the Board of Bar Examiners. [Emphasis added.]

The applicant, Richard O. Lewis, is a 1987 graduate of Western State University College of Law ("WSU") in Fullerton,

Orange County, California. In 1987, WSU had law school campuses in both Orange County and San Diego, but all of Lewis's education was obtained at the Orange County campus. Lewis subsequently was admitted to the practice of law in California in 1993 and in Indiana in 2000. He is presently employed as a law clerk in the Jefferson Family Court and desires admission to the Kentucky Bar Association. To that end, he has filed an application to sit for the Kentucky bar examination. The Board of Bar Examiners ("Board") concluded that the legal education Lewis obtained at WSU does not satisfy the requirements of SCR 2.014(2)(a); thus, the Character and Fitness Committee recommends that his application be denied. Lewis appeals from that denial. Because we disagree with the Board's conclusion, we reverse and remand.

WSU was founded in 1966 and has long been accredited by the state of California. However, as of 1987, it was accredited by neither the ABA nor the AALS. In fact, WSU's application for accreditation was denied following a 1987 in-depth, on-site inspection by an ABA accreditation team. Later, in 1998, the ABA granted WSU provisional accreditation. The only issue before us is whether, in 1987, WSU required a three-year course of study substantially equivalent to the legal education then being provided by approved law schools in Kentucky. Though the rule is written in the present tense, it logically requires an examination and comparison of the legal educations being provided at the time the applicant obtained his education. It would be of little value to examine the quality of education being provided by WSU now, fifteen years after Lewis's graduation. For that reason, the Board did not attempt a present, on-site inspection at WSU. Instead, it retained the services of W. Jack Grosse, former Dean of the Salmon P. Chase School of Law at Northern Kentucky University, to review the 1987 ABA report and render an opinion as to whether WSU was then providing the quality of legal education required by SCR 2.014(2)(a). We have previously recognized Dean Grosse as "a nationally recognized expert in regard to law school accreditation." *In re Brooks,* Ky., 11 S.W.3d 25, 26 (2000). After reviewing the ABA's 1987 report, Dean Grosse concluded that WSU was then providing a three-year course of study that was the substantial equivalent to the legal education then being provided by law schools in Kentucky. After reviewing the same report, the Board concluded otherwise.

The differences of opinion between Dean Grosse and the Board reflects a fundamental difference in emphasis. Dean Grosse emphasized the quality of WSU's faculty and curriculum. The Board emphasized WSU's deficiencies in faculty-incentives and library facilities. To better explain these differences, it is necessary to review the positive and negative aspects of the 1987 ABA report. We note at the outset that the report and accreditation decision pertained not only to WSU's Orange County campus, but also to its smaller San Diego campus, and that some of the cited deficiencies existed only at San Diego.

On the positive side, the owners and operators of WSU were found to be highly qualified. For example, the President, William B. Lawless, was the former Dean of the Notre Dame Law School. The ABA also found that despite the for-profit corporate structure of the school, it was "organized much as any free-standing law school." WSU's administration was handled with "great efficiency" and "state of the art equipment." Generally, the credentials of the faculty were impressive, with more than a third coming from so-called top-rated law schools, including four each from Berkeley and Harvard, and a

"number who attended other law schools graduated with honors and/or served on Law Review." While some of the senior faculty members lacked a systematic record of legal scholarship, the newer members of the faculty in 1987 had "already achieved a fine record of publications." The ABA reported that "overall the teaching was good and, indeed, some of the best classes were of a quality that each member of the team would be more than happy to have in his/her own school." The teaching loads were typical of ABA-approved law schools.

WSU's Orange County campus had thirty-three full-time faculty members who taught seventy percent of the courses and all of the first year courses. The faculty/student ratio was 27.6 to 1, which the ABA deemed adequate. Grades were based on "typical law school examinations" and the grading was "consistent with normal grading practices," with "extensive helpful comments" written on many of the students' bluebooks. The three-year curriculum was typical of most law schools and included thirty-six elective courses offered at the Orange County campus. The legal writing and analysis program was developed by Professor William Statsky, whom the ABA noted was "a prolific author in the legal analysis/legal writing fields."

In 1987, WSU's Orange County campus offered a clinical program and a wide variety of extracurricular activities. The top fifty students academically at the Orange County campus were invited to participate in WSU's Law Review. Additionally, students could choose to participate in the Moot Court Board, the student newspaper, the student bar association, the Women's Law Association, the Black Law Students Association, La Raza (providing support for Latino students), the Disabled Law Students Association, the Democratic Law Students Association, the Republican Law Students Association, the Christian Legal Society, the International Law Society, Amnesty International, and Delta Theta Phi national legal fraternity.

Despite these positive features, the ABA did not approve WSU's 1987 accreditation application. Two negatives figured most prominently in the denial. First, the compensation and benefits received by the faculty were below the ABA's then standards. In particular, faculty salaries were "substantially below" the mean of ABA-approved law schools in California, there was no sabbatical or summer stipend program, and no members of the faculty had tenure.[1] WSU also had no plan for faculty governance.

Second, the physical facilities at WSU were found lacking. The library at the Orange County campus had only 89,901 volumes and the San Diego campus only 50,304 volumes, either of which would have ranked last in total holdings among libraries at ABA approved schools. The ABA declined to combine the holdings of the libraries because they were located ninety miles apart. There was also insufficient classroom space at the Orange County campus during peak teaching hours so that some classes had to be held at a nearby high school. The report also criticized the fact that the San Diego campus was located in leased space. However, the Orange County campus was housed in a building owned by WSU that was then under expansion.

For students, the library's low actual volume count was somewhat offset by an equal number of microform volumes and the availability of both LEXIS and WEST-

---

1. WSU had recently instituted a new tenure system, but only one member of the faculty had applied for tenure as of the 1987 ABA inspection.

LAW, as well as access to neighboring libraries. In particular, WSU faculty and students had access to the California State University at Fullerton library located across the street from WSU, which the ABA described as having a "large collection of ... government documents" and as having "strong holdings of interdisciplinary treatises." Students also had access to the Orange County Law Library in Anaheim (twelve miles away) with 250,000 volumes, and the Los Angeles County Law Library (thirty-five miles away) with over 650,000 volumes. Nevertheless, WSU's own library was indisputably weak and that was a substantial factor in the ABA's denial of accreditation.

The ABA had other reservations that played a role in its 1987 decision to withhold accreditation. As a for-profit enterprise, WSU had no endowment and was dependent upon tuition for its operating expenses. The ABA predicted that its continued vitality could be in jeopardy because of a declining applicant pool. As we now know, the predicted demise did not occur. In addition, WSU had a practice of admitting marginally qualified students with low grades and/or LSAT scores, and consequently suffered from a high attrition/dismissal rate. The California bar examination passage rate for WSU graduates was also well below the average rate for ABA-approved California schools.

Dean Grosse concluded that the negatives mentioned in the ABA report only minimally impacted the quality of legal education being provided. In his opinion, the salaries, benefits, and governance issues for the faculty "really do not have any bearing on the education received by the students." He also opined that the small library was not "of any significance" given the close proximity of the Orange County Law Library. While he agreed that the admission of marginally qualified students

and the low bar passage rate were areas of concern, he added that both were at least "within the ballpark" of similarly situated schools. In conclusion, Dean Grosse emphasized the positives in the 1987 report.

The Administration of the school was praised, the teaching of the full-time faculty was labeled "good," the course of study (the educational program at the law school) in a lengthy treatment was found to be adequate with no articulated deficiencies, and there was a recognition that there was adequate full-time teachers for the academic program.

My conclusion is that Western School of Law was substantially equivalent to Kentucky law schools in 1987. I base this conclusion on what I consider to be very important considerations, education program, teaching, library availability, and school administration.

In reaching the opposite conclusion, the Board emphasized the same deficiencies noted by the ABA in denying accreditation.

Unfortunately, it is clear under our past rules and practice that many of the items mentioned by Mr. Grosse are, his view notwithstanding, quite "substantial." The most striking example[s] ... are the several matters related to the teaching faculty. While such matters as whether the property is leased or owned might be of small significance, the quality and incentives and treatment of the faculty is perhaps the most critical factor, and there was no way we could find a "substantial equivalency" as of 1987 on the basis of the facts available to us.

The Board emphasized both the deficient "quality and incentives and treatment of the faculty," and the inadequacy of the Orange County campus library.

Under SCR 2.014(2)(a), an applicant is not required to prove that the law school from which he/she graduated is the

"substantial equivalent" of an accredited law school, but only that it provided "a three-year course of study that is the substantial equivalent of the legal education provided by" an accredited law school.[2] The burden of establishing that fact rests upon the applicant. *In re Brooks*, Ky., 11 S.W.3d 25, 27 (2000). Here, Lewis made a prima facie showing that the course of study provided by WSU in 1987 was "substantially equivalent" to that provided by law schools in Kentucky. We agree with the Board's expert, Dean Grosse, that the deficiencies relied upon in 1987 by the ABA accreditation team and now by the Board are insufficient to rebut this prima facie case. *Cf. Hubbard v. Kentucky Bar Association*, Ky., 66 S.W.3d 684, 696 (2001). As noted, WSU had a large full-time faculty with excellent credentials who were judged by the ABA to be good teachers. WSU students could participate in Law Review and the Moot Court Board as well as numerous other organizations. Its administration was of high quality and was headed by the former Dean of the Notre Dame Law School. And, although the on-campus library was admittedly deficient, WSU students and faculty had ready access to collections of 250,000 and 650,000 volumes within reasonable distances, as well as access to a substantial number of microform volumes, LEXIS, and WESTLAW.

We agree with the Board's premise that deficiencies in "the quality and incentives and treatment" of a law school faculty can impact the quality of legal education being provided. However, the existence of an attractive compensation package is at best indirect evidence of teacher quality, based on the premise that a law school with an attractive compensation package is likely to lure good teachers with good credentials. The faculty-incentive deficiencies found by the ABA in this case, however, are substantially outweighed by its findings that (1) more than a third of the faculty came from top-rated law schools and a number of others graduated with honors and/or served on Law Review; (2) the newer members of the faculty had already achieved "a fine record of publications;" (3) the teaching was good; (4) the teaching loads were typical of ABA law schools; (5) seventy percent of the classes were taught by full-time faculty members; (6) grading was "consistent with normal grading practices;" and (7) the legal writing and analysis program was developed by a well-known and prolific author. In the face of this direct evidence that the WSU faculty members were, in fact, highly credentialed and effective teachers, the quality of the faculty-incentive package becomes largely irrelevant. Indeed, in 1995, the Department of Justice brought an antitrust lawsuit against the ABA and obtained a consent decree under which the ABA was enjoined from "using law school compensation data in connection with the accreditation ... of any law school." *United States v. American Bar Association*, 934 F.Supp. 435, 436 (D.D.C.1996).

Accordingly, we conclude that the applicant, Richard O. Lewis, graduated from "a law school accredited in the jurisdiction where it exists and which require[d] the equivalent of a three-year course of study that [was] the substantial equivalent of the legal education provided by approved law schools in Kentucky." SCR 2.014(2)(a). We remand this case to the Character and Fitness Committee for further proceedings pursuant to SCR 2.040.

All concur.

ENTERED: October 17, 2002.

2. All three law schools in Kentucky are accredited and all were accredited in 1987.

/s/ *Joseph E. Lambert*
CHIEF JUSTICE